# NO. 12-12-00355-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 392ND* |
| *B.H., C.H, AND D.H,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN* | § | *HENDERSON COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

A.H. appeals the termination of her parental rights to her three children. She raises five issues on appeal. We affirm.

### BACKGROUND

A.H. and C.H. are the parents of three children, B.H., born on March 22, 2007, C.H.1, born on September 8, 2008, and D.H., born on November 17, 2009.[1] On June 8, 2011, the Texas Department of Family and Protective Services (the Department) filed a petition for protection of B.H., C.H.1, and D.H., for conservatorship, and for termination in a suit affecting the parent-child relationship. That same day, the trial court signed an emergency order naming the Department as temporary sole managing conservator of the children. On June 20, 2011, an adversary hearing was held in which A.H. and her attorney personally appeared. The trial court appointed the Department as temporary managing conservator of the children and A.H. and C.H. as temporary possessory conservators of the children.

---

[1] The initials of the father and his middle child are the same. Therefore, we will refer to the father as C.H. and to the middle child as C.H.1.

A bench trial began on May 22, 2012, and ended on June 7, 2012. Ultimately, the trial court determined that the parent-child relationships between A.H., C.H., and the children should be terminated. A.H. appeals the trial court's termination order.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *In re C.L.C.*, 119 S.W.3d 382, 390 (Tex. App.—Tyler 2003, no pet.); *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.—Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001). When the state seeks to terminate one's parental rights, it seeks not only to infringe one's fundamental liberty interest, but to end it. *See In re J.F.C.*, 96 S.W.3d 256, 273 (Tex. 2002). A termination decree is "complete, final, irrevocable [and] divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.—El Paso 1998, no pet.). Thus, the breaking of bonds between a parent and child "can never be justified without the most solid and substantial reasons." *Wiley*, 543 S.W.2d at 352; *In re Shaw*, 966 S.W.2d at 179. Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley*, 543 S.W.2d at 352; *In re Shaw*, 966 S.W.2d at 179. However, parental rights are not absolute, and it is vital that the emotional and physical interests of the child not be sacrificed at the expense of preserving that right. *See In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Section 161.001 of the Texas Family Code permits the termination of parental rights if two elements are met. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2012). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. *Id.* § 161.001(1) (West Supp. 2012); *In re C.L.C.*, 119 S.W.3d at 390. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2012); *In re C.L.C.*, 119 S.W.3d at 390. Both elements must be proved by "clear and convincing evidence," and proof of one element does not alleviate the petitioner's burden of proving the other. *Id.* "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (West 2008). Because there is a strong presumption that the best interest of the child is served by preserving the parent-

2

child relationship, the burden of proof rests upon the party seeking to deprive the parent of her parental rights. *See Wiley*, 543 S.W.2d at 352; *In re C.L.C.*, 119 S.W.3d at 391.

### STANDARD OF REVIEW: SUFFICIENCY OF THE EVIDENCE

When the burden of proof is clear and convincing evidence, we conduct a legal sufficiency review by looking at all of the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* Thus, it follows that the reviewing court should disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible, but this does not mean that the reviewing court must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* If, after conducting our legal sufficiency review, we determine that no reasonable fact finder could form a firm belief or conviction that the matter that must be proven is true, then we will conclude that the evidence is legally insufficient. *Id.*

When we conduct a factual sufficiency review, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *Id.* Our inquiry is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id.* We consider whether the disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *Id.* If, when viewed in light of the entire record, the disputed evidence is so significant that a fact finder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* In finding evidence factually insufficient, the appellate court should detail why it has concluded that a reasonable fact finder could not have credited disputed evidence in favor of its finding. *Id.* at 267.

The standard of review for legal and factual sufficiency challenges maintains a deferential standard for the fact finder's role, which means the trier of fact is the exclusive judge of the credibility of the witnesses and weight to be given their testimony. *In re C.H.*, 89 S.W.3d at 26-27; *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.—Houston [1st Dist.] 1997,

pet. denied). Thus, our review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt. *In re C.H.*, 89 S.W.3d at 26.

## TERMINATION UNDER SECTION 161.001(1)(E)

In her first issue, A.H. makes a general challenge to the legal and factual sufficiency of the evidence supporting the trial court's judgment. In her other four issues, she argues that the trial court erred by terminating her parental rights under family code subsections 161.001(1)(D), (E), (O), and 161.001(2), respectively. We first discuss the sufficiency of the evidence with regard to subsection (1)(E), whether A.H. engaged in conduct or knowingly placed her children with persons who engaged in conduct that endangered their physical or emotional well being (A.H.'s third issue, and part of her first issue). *See* TEX. FAM. CODE ANN. § 161.001(1)(E) (West Supp. 2012).

## Applicable Law

A court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well being of the child. *See* TEX. FAM. CODE ANN. § 161.001(1)(E).

"Endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). It is not necessary that a parent's conduct be directed at the child or that a child actually suffers injury in order for endangerment to exist. *Id.* It is sufficient that the child's well being be jeopardized or exposed to loss or injury. *In re J.J.*, 911 S.W.2d 437, 440 (Tex. App.— Texarkana 1995, writ denied). Danger to the child need not be established as an independent proposition and may be inferred from parental misconduct, even if the conduct is not directed at the child and the child suffers no actual injury. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App—Houston [1st Dist.] 2009, pet. denied).

A parent's conduct is evidenced not only by the parent's actions, but also by the parent's omission or failure to act. *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 435 (Tex. App.—El Paso 2004, no pet.). Without question, sexual abuse is conduct that endangers a child's physical or emotional well being. *See In re L.C.*, 145 S.W.3d 790, 796 (Tex. App.—Texarkana 2004, no pet.). But parental knowledge that an actual offense has occurred is

not necessary. *Id.* It is sufficient that the parent was aware of the potential for danger (of sexual abuse) and disregarded that risk. *See id.* Furthermore, conduct that subjects a child to a life of uncertainty and instability also endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.).

Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The requisite endangerment may be found if the evidence shows a parent's course of conduct that has the effect of endangering the child's physical or emotional well being. *Id.* In considering whether a relevant course of conduct has been established, a court properly may consider evidence of conduct that occurred both before and after a child's birth. *Id.* A court may also consider evidence establishing that a parent continued to engage in endangering conduct after the child's removal by the Department or after the child no longer was in the parent's care, thus showing the parent continued to engage in the course of conduct in question. *Id.*

### A.H.'s Conduct Prior to Children's Birth and Removal

At the time of trial, A.H. was twenty-five years old and had given birth to five children. A.H. first became pregnant at the age of fourteen, but had a miscarriage after her boyfriend pushed her down a flight of stairs. A.H. had other unsuccessful pregnancies, but by the age of eighteen, she had given birth to two children.[2] A.H. testified that when she was pregnant with her firstborn child, she lived in Maryland, was emancipated, and obtained a marriage license with her child's father, Mark, but it was "not legal."[3] Sometime after A.H. gave birth to their second child, her relationship with Mark ended. A.H. did not take the children upon separating from Mark, even though she had told her mother, Darlene, that Mark was physically abusive.

At trial, Darlene was asked whether she knew where A.H. lived after she lived in Maryland. Darlene answered, "Honestly, I don't know. She's gone from Maryland to Pennsylvania to Texas back to Pennsylvania to Maryland. I honestly don't remember the dates and all of that."

---

[2] A.H.'s two oldest children are not the subject of this suit. At trial, A.H. testified that she had been pregnant thirteen times.

[3] When A.H. was fifteen years old, her family moved from Maryland to Texas. A.H. remained in Maryland with Mark.

A.H. married C.H. when she became eighteen in 2005. Upon marrying C.H., A.H. moved to Pennsylvania. But between 2005 and 2007, A.H. also spent time in Texas because she was on probation from 2005 to 2007 out of Harris County.

B.H. was born on March 22, 2007. Between March and December 2007, the Department received an intake alleging neglectful supervision and physical neglect of B.H. by both A.H. and C.H. Both parents were alleged to be using drugs, leaving B.H. alone in her crib while they visited friends in neighboring apartments, allowing "a lot of traffic in and out of the home," and having drugs and alcohol inside the home. The Department investigated the matter and ruled out physical neglect, but was unable to determine whether the parents engaged in neglectful supervision. The Department referred A.H. and C.H. to Family Based Safety Services (FBSS), but they moved to Pennsylvania before participating in the services offered by FBSS.

Between December 2007 and September 2008, the Pennsylvania Children and Youth Services (CYS) received an intake raising concerns about the home in which A.H., C.H., and B.H. were living. A.H. testified that she was pregnant with C.H.1 when the report was made. She explained that CYS conducted an investigation because several people were living in her home and "we couldn't afford everybody [and] I asked [the caseworker] if she could help me get them out."

C.H.1 was born on September 8, 2008. CYS responded to another report, but this time it pertained to A.H.'s mental health status. A.H. testified that she thought the hospital dropped C.H.1 because he had a "black eye." It was later determined that the cause of C.H.1's "black eye" was a cyst that was removed. A.H. testified that she wrote a letter of apology to the hospital on her own accord, without any suggestion from CYS.

Approximately three months later (December 2008), CYS received another report. The report alleged that the family's home was about to lose electricity. C.H. had lost his job, and neither C.H. nor A.H. was working during this time. A.H. testified that their electricity was never shut off. But she also testified that she worked "community services" with CYS and that "[CYS] helped as far as electricity to get our light bill paid."

In March 2009, CYS received another report alleging that C.H. was abusing six-month-old C.H.1. A.H. was actively participating in services with CYS as a result of the earlier CYS report. A.H. testified that CYS conducted an investigation on the March report and found the allegations to be "not true." But evidence at trial revealed that A.H. knew that C.H. had been

6

"locked up" from the ages of twelve to eighteen for sexually molesting his younger brothers.[4] Nevertheless, A.H. allowed him to have unsupervised visits with B.H. and C.H.1.

In May 2009, CYS removed B.H. and C.H.1 from C.H. and A.H.'s care for three days. A.H. testified that CYS's involvement was not her fault because it was due to another child getting injured in her home. A.H. testified that her then-brother-in-law and his girlfriend were living with them in an old two story house. A.H. testified that the girlfriend was sleeping while her child was awake, and the child ran through a second story window. Once the children were returned to C.H. and A.H., the family moved in with Darlene and her family in Texas. Upon receiving a report from CYS, the Department conducted its own welfare check of the children.

On November 17, 2009, A.H.'s youngest child, D.H., was born. Between May 2009 and January 2010, A.H. and her family often lived with Darlene. Darlene testified, "They were in and out of my house all the time. They stayed with me for three months at a time to six months at a time and then they would find a place and move back in. It was [a lot of back and forth] all the time." But by December 2009, A.H. and C.H. had separated.

In January 2010, A.H. began an online relationship with Branden. Branden was a mutual friend, was approximately twenty years old, and had served two years in a Pennsylvania juvenile detention center for fighting, threatening, stealing, breaking and entering, and domestic violence. A.H.'s counselor testified that Branden also had a drug history and grew up in a "very dysfunctional situation."

In May 2010, A.H. went to Pennsylvania. She did not return to Texas until July 2010. From May 2010 to July 2010, A.H. did not have her children. A.H. left three-year-old B.H., twenty-month-old C.H.1, and six-month-old D.H. with various relatives while she pursued a romantic relationship with Branden. When A.H. returned to Texas with Branden at her side, they, along with A.H.'s children, moved in with A.H.'s parents. Shortly thereafter, Darlene "kicked Branden out of [their] home" because he "refused to get a job." Even though A.H. and the children were welcome to stay, A.H. followed Branden by moving her children from their grandmother's home and staying in a shelter for "a few months."

In January 2011, the Department received an intake alleging neglectful supervision of the children. At the time the intake was made, A.H. was living with a "family friend." But when the

---

[4] A.H. testified that when she married C.H., his family told her that nothing had ever happened. But testimony from A.H.'s counselor suggested that A.H. knew the allegations were true.

7

investigation began, A.H. and her children were living in an apartment in Athens. The intake alleged that A.H. was leaving her children with a family friend who had a drinking problem. The Department's investigation revealed that the children's babysitter was an admitted alcoholic. A.H. told a Department investigator that she knew the woman was "drunk most of the time," but had no choice about leaving the children with her because all of the local daycares were full. A.H. knew that the babysitter did not change the children's diapers because they would be wearing the same diaper at the end of the day that they wore in the morning. The investigation also revealed that D.H. suffered from severe diaper rash that extended to the back of his legs and that the children did not have a primary doctor and were not up-to-date on their "medical." The Department coordinated daycare for the children, but by this time, A.H. was no longer working.

On February 22, 2011, the Department received another call regarding A.H. and her children. A.H. told the Department that she and Branden were involved in a physical altercation because B.H. misplaced Branden's can of tobacco. Branden became angry and pulled B.H. by her hair. A.H. then "went after" Branden, and he was arrested. When A.H. reported the incident to the investigator, she told her that she was living with a "family friend" and that her children were at her parents' home. Testimony later revealed that Branden was living with the same family friend. While A.H. and Branden lived with the family friend, her children were with their grandmother and great-grandmother.

In April 2011, A.H. and her children moved into a "government home" with the help of her parents.[5] A.H. informed the Department that she was ready for Branden to move back in with her and the children. The investigator testified that when she went to A.H.'s apartment, she provided A.H. with a second "Pack N Play" so that D.H. would not have to sleep on the floor. A.H. told the investigator that the first "Pack N Play" she received from the Department in January was broken by the children and was no longer usable. The record is unclear as to whether Branden began living with A.H. and her children at this time.

On June 3, 2011, the Department received an intake alleging that C.H.1 suffered a broken arm, but the cause was unknown. When the Department conducted its investigation, it learned that A.H.'s children referred to Branden as "daddy," and B.H. told the investigator that "daddy broke [C.H.1's arm]." During this time, A.H. had an open case with FBSS.

---

[5] The record suggests that sometime before A.H. moved into government housing, she and her children were living at her mother's house.

On June 7, 2011, the Department received another intake alleging that A.H.'s three children were left alone in her apartment. A.H. was adamant that she asked a neighbor, "Sharon," to watch the children while she was gone. Nevertheless, the Department removed the children and temporarily placed them with a family member. While searching for a suitable placement, Darlene told an investigator that if the children could not be with family, it would be better for them to be in foster care "because [A.H. and Branden] put their needs before the children['s]." When the investigator transported the children on the night of the removal, C.H.1 said that "[d]addy broked my arm."

**Conduct After Removal**

Shortly after the children's removal, A.H. and Branden were forced to move out of government housing because Branden had "gotten drunk," broken the blinds, and caused a scene. A.H. maintained that they were never evicted.[6] They found a trailer to live in rent free until February 2012, on the condition that they remodel the trailer. A.H., Branden, and their friend Dale helped remodel the trailer. A.H. knew that Dale was a convicted felon, and testified that he did all of the remodeling because Branden did not know how to fix houses.

In October 2011, Dale and Branden had an altercation that resulted in Branden's needing stitches above his eye. A.H. testified that while she was working on their house, Branden startled her and she screamed. A.H. testified that when Dale heard A.H.'s scream, he "attacked" Branden. Despite the altercation, A.H. and Branden continued to welcome Dale's help with their home, as well as transportation, even though association with known felons was prohibited by A.H.'s service plan.

Throughout the case, A.H. had difficulty maintaining a stable mode of transportation. A.H. testified that she drove a van until it was repossessed. After the van was repossessed, A.H.'s grandfather gave her money from savings bonds that allowed her to purchase another vehicle. But not long after A.H. purchased the vehicle, Branden "got mad and stripped the gears in that car." The record is unclear as to when A.H. purchased the vehicle and when Branden "stripped" the gears in it. But regardless of when Branden "ruined" A.H.'s vehicle, she continued a relationship with him despite his destructive and violent behavior. A.H.'s counselor testified that after this incident, A.H. and Branden attended counseling sessions in which they told her that they "actually walked" to her office.

---

[6] A.H. was not required to pay rent while living in government housing.

When A.H.'s counselor testified, she noted in her April 2012 report that A.H. did not discuss her children in any way that showed she was attached or bonded to them. A.H. did not talk very much about the children to her counselor. In May 2012, A.H.'s counselor noticed a "big" bruise on A.H.'s arm. The testimony is conflicting as to whether the bruise was caused by a fight with Dale's girlfriend or by Dale's pulling A.H. away from his girlfriend during their altercation. But it is undisputed that A.H. was arrested for public intoxication that same night.

A.H.'s counselor prepared a final assessment that concluded A.H.'s situation was "not improved enough to put small children into the home." Her assessment was based on the fact that A.H. continued to have "erratic" behavior and conflicts in the community, had an unstable relationship with Branden, was dependent on others, had no mode of regular transportation, and continued to associate with men having "troubled path[s]."

In May 2012, A.H. and Branden had a celebration because they were getting back together. A.H. testified that they had broken up the "last time" Branden went to jail, but when he was released on bond, they decided to get back together. On May 17, 2012, five days before the beginning of A.H.'s termination trial, A.H., Branden, and two other people had a party. Branden "drank about [thirty] beers," and got "into a fight [with A.H.]." Branden "went to hit [A.H.], and [one of their friends] stepped in between." The friend who received the brunt of Branden's blow required surgery that night. A.H. "had been battered herself," and stayed with her mother after the incident. Despite A.H.'s testimony that her relationship with Branden was over, A.H. told her caseworker that she still loves Branden and would not press charges against him for his most recent assaults. The caseworker testified that she did not believe A.H. and Branden "would be broken up for good."

**Undisputed Facts Not Supporting the Finding**

It is undisputed that at the time of removal, the children did not appear to be malnourished.

**Disputed Evidence**

The evidence is disputed as to whether A.H. in fact asked a neighbor to babysit her children on the night of the removal. Some witnesses confirmed that A.H. made the request while others denied it. Yet the neighbor who was allegedly asked to watch the children never testified.

10

The evidence is also disputed as to whether A.H. maintained stable employment. Testimony showed that she was working for her landlord doing odd jobs, and that the reason the landlord hired A.H. was because she "felt sorry for her." Furthermore, the evidence suggests that A.H. continued to have difficulty paying her utility bills. A.H. confirmed that money "has been tight" and testified that she had to use a "prepaid credit card" provided by her grandfather to pay down the balance on her electricity bill.

## Conclusion

After viewing the evidence in the light most favorable to the finding, we conclude that a reasonable fact finder could form a firm belief or conviction that A.H. engaged in conduct or knowingly placed her children with persons who engaged in conduct that endangered their physical or emotional well being. *See In re J.F.C.*, 96 S.W.3d at 266. A.H. had an extensive history of being in relationships with abusive men beginning at the age of fourteen when she suffered a miscarriage because she was pushed down a flight of stairs by her boyfriend. *See Perez*, 148 S.W.3d at 436 (abusive or violent conduct in home can create endangering environment for child's well being); *see also In re C.J.F.*, 134 S.W.3d 343, 351 (Tex. App.— Amarillo 2003, pet. denied) (domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment). A.H.'s involvement with abusive men also resulted in actual harm being imposed on her children.

A.H. knew (or was at least aware of allegations) that C.H. molested his younger brothers, yet she allowed C.H. to have unsupervised access to B.H. and C.H.1.[7] B.H.'s and C.H.1's sexual behavior at such a young age suggests that they were subjected to more than just a risk of being sexually abused. *See In re L.C.*, 145 S.W.3d at 796 (parental knowledge that actual offense occurred is not necessary).

A.H. chose an alcoholic to babysit B.H., C.H.1, and D.H. A.H. knew that she was placing her children with an individual who was "drunk most of the time," and never changed the children's diapers. As a result, D.H. suffered a "severe" diaper rash, and C.H.1 was injured when he climbed onto a drawer at the babysitter's house, fell, and hit his head. This evidence

---

[7] The record shows that B.H. engaged in sexual behavior by January 2011 when she was living with A.H. In October 2011, C.H.1 began to exhibit signs of sexual abuse, and the Department confronted A.H. with this information. A.H. told the caseworker that C.H. was now in jail for things "like that." Specifically, A.H. testified that C.H. was now in jail for "child pornography, child molestation and corruption of [a] minor." The victim was A.H. and C.H.'s goddaughter. A.H. also told her caseworker that she always thought it was "odd" when C.H. would return the children from his unsupervised visits because he would bring them back during the early morning the following day.

11

also supports a finding that A.H. knowingly placed the children with an individual who engaged in conduct that endangered the well being of the children. *See* TEX. FAM. CODE § 161.001(1)(E).

A.H.'s relationship with Branden supports the conclusion that her involvement with abusive men and placing her children with abusive men was a course of conduct that continued after she separated from C.H. It is undisputed that Branden picked B.H. up by her hair and then also assaulted A.H. There is suspicion that Branden caused C.H.1's broken arm. Furthermore, A.H.'s frequent relocations with her children (and at times, abandonment of them) in order to maintain her relationship with Branden, even after he abused B.H., shows a course of conduct that endangered her children's well being. A.H. continued this conduct after her children were removed, despite the fact that Branden's actions resulted in her being evicted from her apartment and having no reliable mode of transportation. *See In re C.A.B.*, 289 S.W.3d at 883; *see also In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) (conduct that subjects child to life of uncertainty and instability endangers child). Therefore, the evidence is legally sufficient to support termination of A.H.'s parental rights under subsection (E).

After reviewing the entire record and considering the disputed evidence, we also conclude that a fact finder could reasonably have formed a firm belief or conviction about the truth of the Department's allegations. *See In re J.F.C.*, 96 S.W.3d at 266. The disputed evidence at trial did not call into question the fact that A.H. engaged in a course of conduct that was endangering to her children before and after their birth. The evidence also shows that A.H. did not abandon the endangering conduct that contributed to her children's removal. Thus, the evidence is factually sufficient to support termination of A.H.'s parental rights under subsection (E).

We overrule A.H.'s first issue as it pertains to the legal and factual sufficiency of the evidence supporting termination pursuant to Section 161.001(1)(E). We also overrule A.H.'s third issue relating to the legal and factual sufficiency of the evidence supporting termination under Section 161.001(1)(E).

Because we have held the evidence is legally and factually sufficient to support termination of A.H.'s parental rights pursuant to Section 161.001(1)(E), we need not address A.H.'s general challenge to the legal and factual sufficiency of the evidence in her first issue as it relates to her second and fourth issues challenging the sufficiency of the evidence for termination under subsections (1)(D) and (1)(O). We also need not address A.H.'s second and fourth issues.

*See* TEX. R. APP. P. 47.1.; *In re C.C.*, No. 12-09-00429-CV, 2011 WL 198595, at \*6 n.2 (Tex. App.—Tyler Jan. 19, 2011, no pet.) (mem. op.) (when evidence is sufficient to support termination under one ground, appellate court need not address sufficiency challenges to other grounds for termination in Section 161.001(1)).

BEST INTEREST OF THE CHILD

In her fifth issue, A.H. contends the evidence is legally and factually insufficient to show that termination is in her children's best interest.

## Applicable Law

Parental rights may not be terminated merely because a child might be better off living elsewhere. *In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.). The party seeking termination must prove by clear and convincing evidence that termination of a parent's rights to his or her child is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(2). The prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *See* TEX. FAM. CODE ANN. § 263.307(a) (West 2008). But there is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

The courts consider a number of factors to determine the best interest of the child. Among those factors are (1) the child's age and vulnerabilities; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the magnitude, frequency, and circumstances of harm to the child; (5) the parental abilities of the individuals seeking custody; (6) the stability of the home or proposed placement; (7) whether there is a history of abusive or assaultive conduct by the child's family or others; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; (9) any excuse for the acts or omissions of the parent; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and (12) whether an adequate support system consisting of an extended family and friends is available to the child. *See* TEX. FAM. CODE ANN.

13

§ 263.307(b) (West 2008); *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *Salas v. Tex. Dep't Protective & Regulatory Servs.*, 71 S.W.3d 783, 791 (Tex. App.—El Paso 2002, no pet.).

The above list does not include all of the factors found in Section 263.307 of the family code, nor does it include all of the factors enunciated in *Holley*. Moreover, the Department need not prove all of the statutory or *Holley* factors to prove that termination is in the best interest of the child. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.— Houston [14th Dist.] 2003, no pet.). Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28-29.

## Children's Ages, Vulnerabilities, and Harm

At the time of trial, A.H.'s oldest child was five years old, her middle child was almost four years old, and her youngest child was two years old. B.H. goes to therapy once a month to cope with various issues. B.H. had to be moved from her original foster home because she had engaged in sexual behavior towards another child. Testimony also revealed that C.H.1 required close supervision because he was found kissing his younger brother's penis. C.H.1's behavior was described as "aggressive" and "destructive."

It is undisputed that B.H. was harmed by Branden's conduct as described in the preceding section. The evidence also suggests that Branden was responsible for C.H.1's broken arm. Finally, D.H.'s severe diaper rash was caused, in part, by A.H.'s use of a woman "who was drunk most of the time" to babysit her children. These factors weigh in favor of termination. *See* TEX. FAM. CODE ANN. § 263.307(b)(1), (3), (7); *Holley*, 544 S.W.2d at 372.

## Stability

From the time B.H. was born, state agencies have monitored the children and their parents at least one time each year. As we have already discussed, A.H. has a history of moving from place to place in order to maintain or facilitate romantic relationships with abusive men. The stability of A.H.'s current home is conditioned upon her maintaining "employment" with her landlord and is subject to termination if A.H. renews her relationship with Branden. This factor weighs in favor of termination. *See id.*; *see also In re A.A.A.*, 265 S.W.3d 507, 518 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (frequent moves and job changes weigh against parent's ability to provide stable, permanent home for child); *In re M.N.G.*, 147 S.W.3d 521,

14

540 (Tex. App.—Fort Worth 2004, pet. denied) (stability of parent's home contingent upon third party support and "tenuous" at best).

**Parent-Child Relationship Not a Proper One**

In addition to all of the other evidence, it is undisputed that A.H. has a history of voluntarily absenting herself from her children in order to pursue romantic relationships.[8] Although A.H. missed only two visits from June 2011 to June 2012, she was usually late when she arrived. In fact, A.H. had a one hour visit with her children after the bench trial began and was forty-five minutes late. This also weighs in favor of termination. *See Holley*, 544 S.W.2d at 372.

**Support System, Positive Change, and Parenting Skills**

Although there is some disputed evidence that A.H. has a family support system capable of helping her with the children, A.H.'s history shows an unwillingness to utilize those resources unless it allows her to facilitate a relationship with someone other than her children. Thus, those resources are available to the children only if A.H. chooses to request them. *See* TEX. FAM. CODE ANN. § 263.307(b)(13). A.H.'s extensive history of past services from CYS in Pennsylvania and the Department in Texas illustrates that she is incapable of effecting positive environmental and personal changes within a reasonable period of time. *See id.* § 263.307(b)(11). Furthermore, A.H.'s lack of progress in counseling, when considered along with all of the previously stated facts, supports the Department's contention that A.H. has failed to demonstrate adequate parenting skills. *See id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 372. Thus, we conclude that these factors also weigh in favor of termination.

**Conclusion**

Viewing this evidence, along with the evidence discussed in our review of the termination finding, in the light most favorable to the finding, we conclude that the fact finder could reasonably have formed a firm conviction that termination of A.H.'s parental rights was in her children's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. Viewing the record as a whole, we conclude that the fact finder could reasonably have formed a firm conviction that termination of A.H.'s parental rights was in her children's best interest. *See id.* Furthermore, we conclude that the disputed evidence is not so significant to conclude that the fact finder's decision was

---

[8] A.H. confirmed that she had not seen her two oldest daughters in three years because they lived in Maryland. Instead of traveling to Maryland to see her daughters in May 2010, A.H. went to Pennsylvania and lived with Branden for two months.

unreasonable. *See id.* Therefore, we hold that the evidence of the children's best interest is legally and factually sufficient to support the trial court's best interest finding. We overrule A.H.'s general challenge to the legal and factual sufficiency of the evidence in her first issue as it relates to her fifth issue challenging the sufficiency of the evidence supporting the trial court's best interest finding. We also overrule A.H.'s fifth issue.

## DISPOSITION

We have overruled A.H.'s first issue as it pertains to her third and fifth issues. We have also overruled A.H.'s third and fifth issues. Having determined that the evidence is sufficient, we need not address the remaining portions of A.H.'s first issue, or her second and fourth issues. *See* TEX. R. APP. P. 47.1. We *affirm* the trial court's termination order.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered April 3, 2013.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

16



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**APRIL 3, 2013**

**NO. 12-12-00355-CV**

**IN THE INTEREST OF B.H., C.H., AND D.H., CHILDREN**

---

Appeal from the 392nd Judicial District Court

of Henderson County, Texas. (Tr.Ct.No. 2011B-0155)

---

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the order.

It is therefore ORDERED, ADJUDGED and DECREED that the termination order of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

17